**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DARRYL MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-08778 |
| | ) | |
| v. | ) | Judge Ellis |
| | ) | |
| LIONEL PIPER, DENNIS HUBERTS, | ) | Magistrate Judge Gilbert |
| JEFFREY WEST, GREGORY | ) | |
| SLOYAN, DACHAE BLANTON, and | ) | |
| the CITY OF CHICAGO, | ) | |
| | ) | **JURY DEMANDED** |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

NOW COMES Plaintiff, DARRYL MOORE, by and through his attorneys, and

complains against the Defendants, LIONEL PIPER, JEFFREY WEST, DENNIS HUBERTS,

GREGORY SLOYAN, DACHAE BLANTON, and CITY OF CHICAGO as follows:

### Jurisdiction and Venue

1.      This is an action for constitutional violations by Chicago police officers and the

City of Chicago.

2.      This action arises under the United States Constitution and the Civil Rights Act

of 1871 [42 U.S.C. Section 1983].

3.      This court has jurisdiction by virtue of 28 U.S.C. Sections 1343 and 1331.

4.      Venue is proper in the Northern District of Illinois under 28 U.S.C. Section 1391

because the acts complained of occurred here and, upon information and belief, the Defendants

reside here.

1

## Parties

5.     At all times herein mentioned, Plaintiff, Darryl Moore, was and is a citizen of the United States, and resides within the jurisdiction of this court.

6.     At all times herein mentioned, Defendant LIONEL PIPER was employed by the City of Chicago Police Department and was acting under color of state law and within the scope of his employment for the City of Chicago. This Defendant is being sued in his individual capacity.

7.     At all times herein mentioned, Defendant JEFFREY WEST was employed by the City of Chicago Police Department and was acting under color of state law and within the scope of his employment for the City of Chicago.  This Defendant is being sued in his individual capacity.

8.     At all times herein mentioned, Defendant DENNIS HUBERTS was employed by the City of Chicago Police Department and was acting under color of state law and within the scope of his employment for the City of Chicago. This Defendant is being sued in his individual capacity.

9.     At all times herein mentioned, Defendant SGT. GREGORY SLOYAN was employed by the City of Chicago Police Department was acting under color of state law and within the scope of his employment for the City of Chicago. This Defendant is being sued in his individual capacity.

10.     At all times herein mentioned, Defendant SGT. DACHAE BLANTON was employed by the City of Chicago Police Department was acting under color of state law and within the scope of his employment for the City of Chicago. This Defendant is being sued in his individual capacity.

2

11.     At all times herein mentioned, the CITY OF CHICAGO was a political division of the State of Illinois, existing as such under the laws of the State of Illinois, and maintained, managed, and/or operated the City of Chicago Police Department.

### Facts

12.     On April 6, 2013, the defendant officers executed a search warrant at 239 W. 105th St., Chicago, IL (hereinafter "the home").

13.     The home was owned by Moore's great-grandmother.

14.     Moore did not live at the home on April 6, 2013.

15.     The officers claimed that they found cocaine in the rafters of the home's basement ceiling.

16.     The officers claimed that they found ammunition in a drawer of a table in one of the living areas of the home.

17.     The defendant police officers pressured Moore to "give them a gun." They threatened that if he did not, they would charge him with possessing the ammunition and drugs they said they had found—despite their having no evidence he possessed those things.

18.     When he told them that he did not have a gun to give them, they carried through on their threat: they charged (or caused him to be charged) him with possession of ammunition and crack cocaine.

19.     The officers drafted police reports that included false statements that they saw Moore climb out a window and run (to demonstrate "consciousness of guilt") and that they had

3

found "proof of residency" at the home, despite the fact that the letter was more than 6 months old[1].

20.     They then sent Moore (or caused him to be sent) to Cook County Jail, where he remained for over 6 months until his trial on October 28, 2013.

21.     During the course of his criminal prosecution, the defendant police officers submitted false reports to prosecutors and gave false accounts to prosecutors, which those prosecutors relied upon to prosecute Moore.

22.     At a bench trial on October 28, 2013, Moore was found guilty and sentenced to 6 years in the Illinois Department of Corrections.

23.     The evidence that the officers fabricated and submitted to prosecutors was used to secure Moore's pre-trial detention and obtain his conviction.

24.     The Defendants' actions were intentional, willful and wanton.

25.     Moore appealed his conviction.

26.     The appellate court reversed his conviction on December 16, 2015.

27.     Moore was set free on or around January 26, 2016.

28.     Before his release, Moore had spent twenty-seven (27) months imprisoned in the Illinois Department of Corrections.

**Count I: Against the Individual Officers for Unlawful Post-Arrest, Pre-Trial Detention**

29.     Plaintiff hereby incorporates and re-alleges the above paragraphs as though fully set forth at this place.

---

[1] Prior to April 6, 2013, the Illinois Appellate Court had held that a six-month-old letter was insufficient to establish residency under a theory of constructive possession. *People v. Ray*, 232 Ill. App. 3d 459.

4

30.     The Fourth Amendment of the U.S. Constitution protects people from post-arrest, pretrial detentions without probable cause.

31.     The defendant police officers violated Moore's rights in one or more of the following ways: they knowingly fabricated evidence that was used to secure Moore's post-arrest, pre-trial detention; they charged him with crimes for which they had no probable cause because he did not give them a gun as they demanded[2]; they caused him to be charged with and prosecuted for possession of ammunition without any basis to believe he possessed ammunition; and they caused him to be charged with and prosecuted for possession of cocaine without any basis to believe he possessed cocaine.

32.     Moore was damaged by these violations of his rights: he spent more than 6 months in Cook County Jail prior to his conviction.

33.     His conviction was reversed on December 16, 2015.

34.     As a result of the above described facts, the defendant police officers are liable to Darryl Moore under Section 1983.

35.     Plaintiff asks that punitive damages be awarded against the Defendants to punish them, but also to deter them and others like them from engaging in such behavior in the future.

## Count II: Against the Individual Officers for Violations of Due Process

32.     Plaintiff hereby incorporates and re-alleges the above paragraphs as though fully set forth at this place.

33.     Under the U.S. Constitution, no person shall be deprived of liberty without due process of law.

---

[2] A *Monell* claim based on similar Chicago police behavior is alleged in *Stokes v. City of Chicago et al*, Case No. 16-cv-10621, currently pending in the Northern District of Illinois.

34.     The defendant police officers violated Moore's rights in one or more of the following ways: they knowingly fabricated evidence that was introduced against him at his criminal trial and that was material to obtaining his conviction, thereby depriving him of a fair trial; they knowingly fabricated evidence that was used to secure Moore's post-arrest, pre-trial detention; they charged him with crimes for which they had no probable cause because he did not give them a gun as they demanded; they caused him to be charged with and prosecuted for possession of ammunition without any basis to believe he possessed ammunition; and they caused him to be charged with and prosecuted for possession of cocaine without any basis to believe he possessed cocaine.

35.     Moore was damaged by these violations of his rights: he spent 2.8 years behind bars (first in Cook County jail and then in Illinois Department of Corrections).

36.     His conviction was reversed on December 16, 2015.

37.     As a result of the above described facts, the defendant police officers are liable to Darryl Moore under Section 1983.

38.     Plaintiff asks that punitive damages be awarded against the Defendants to punish them, but also to deter them and others like them from engaging in such behavior in the future.

## Count III: Against the City of Chicago for Municipal Liability under Section 1983 (*Monell* Claims)

39.     Plaintiff hereby incorporates and re-alleges the above paragraphs as though fully set forth at this place.

40.     As described more fully above, City of Chicago police officers (namely the individual Defendants) violated Moore's constitutional rights.

41.     At the time of these violations and for years prior, a code of silence, under which City of Chicago police officers remained silent about other officers' misconduct and covered up police misconduct by not telling the truth, existed within the City of Chicago's police department.

42.     The following facts demonstrate the existence of such a code of silence within the City of Chicago's police department:

a.  In 2007, in *Klipfel, et al. v. City of Chicago, et al.,* No. 94-cv-6415 (N.D.Ill), a jury found that, as of 1994, the City of Chicago's police department maintained a code of silence that enabled and caused a City of Chicago police officer to engage in police misconduct and retaliate against the plaintiffs for reporting misconduct.

b.  In 2017, the City of Chicago paid $20,000,000 to settle *Manzera, et al. v. Frugoli, et al.*, No. 13-cv-0526 (N.D. Ill.), in which the plaintiffs alleged: that the code of silence had enabled and caused City of Chicago police officer Joseph Frugoli to, in 2009, kill two men while he was driving drunk; and that the City of Chicago's police department had hidden evidence of Frugoli's role in the deaths, as well as his past record of alcohol-based misconduct.

c.  In a January 13, 2017 report issued after its year-long investigation into the City of Chicago's police department, the United States Department of Justice (the "DOJ") stated that the City of Chicago, its police officers, its leaders within the police department, and its police officer union all acknowledged that a code of silence among City of Chicago police

officers exists, and that it extends to lying and making affirmative efforts to conceal evidence.

d.  The DOJ further stated, "[w]hat is clear from our investigation, however, is that a code of silence exists, and officers and community members know it" and that it is "apparently strong enough to incite officers to lie even when they have little to lose by telling the truth."

e.  Indeed, in December 2015, the City of Chicago's Mayor publicly acknowledged that a code of silence exists within the City of Chicago's police department; in fact, attorneys for the City of Chicago have gone as far as offering to admit to the existence of such a code of silence in civil litigation in order to prevent the Mayor's deposition about the code.

f.  In interviews with the DOJ, City of Chicago police officers and high-level police department officials alike agreed that a code of silence exists;

g.  In December 2016, the president of the City of Chicago's police officer union also admitted that such a code of silence exists within the police department.

h.  Tellingly, in an interview with the DOJ, a sergeant in the police department stated "if someone comes forward as a whistleblower in the [police] department, they are dead on the street";

43.  At the time of the violations alleged by DARRYL MOORE herein, and for years prior, the City of Chicago failed to adequately investigate and discipline its police officers for taking police action without adequate legal cause, fabricating/manufacturing evidence, lying

during investigations into police misconduct, lying to prosecutors, and lying during court proceedings.

44.     The following facts demonstrate the City of Chicago's failures to investigate and discipline adequately:

        a.   In the five years preceding the DOJ's investigation (which began on December 7, 2015), the City of Chicago received over 30,000 complaints of police misconduct, but fewer than 2% of those were "sustained," resulting in no discipline at all 98% of the time;

        b.   Problematically, the DOJ found that the City of Chicago failed to even investigate the majority of cases that it was required by law to investigate, mostly because the complainants did not provide supporting affidavits (58% of civilian complaints from 2011-2014 were closed because the complainant did not sign an affidavit), but also because the City of Chicago had a policy of not investigating anonymous and older misconduct complaints, as well as those alleging lower-level force, non-racial verbal abuse, and most Taser discharges and officer-involved shootings where nobody was hit.

        c.   The DOJ further concluded that the City of Chicago's failure to fully investigate almost half of all police misconduct cases during this time-period seriously undermined accountability, and that these failures were lost opportunities to identify misconduct, training deficiencies, and problematic trends, as well as to hold officers accountable;

d. Moreover, the DOJ found that, even when the City of Chicago did investigate complaints of police misconduct, its investigations suffered from serious flaws, such as:

   i. witnesses, including accused officers, were often not interviewed at all (or not interviewed until long after the incidents had occurred);

   ii. the process routinely allowed for inappropriate coordination of testimony and collusion among officers, as well as witness coaching by police union attorneys and representatives, without impacting the investigators' evaluation of the case (in fact, there were protocols prohibiting investigators from preventing witness coaching, or from even referring to it on tape);

   iii. the questioning was often cursory and aimed at eliciting favorable statements to justify officers' actions;

   iv. the questioning often failed to challenge inconsistencies and illogical explanations from officers;

   v. the questioning was often leading in a way favorable to officers;

   vi. investigators routinely failed to review available probative evidence;

   vii. investigator reports were often drafted in a manner favorable to officers—investigators often omitted conflicting testimony from officers, omitted evidence undermining officers' claimed justifications, and exaggerated evidence favorable to officers; and

      viii.  there was a consistent unwillingness by investigators to probe or challenge officers' accounts of incidents, even when these accounts were inconsistent with physical evidence, credible eyewitness statements, or common sense.

e. Specific to officer dishonesty, the DOJ found that the City of Chicago treated efforts by police officers to hide evidence as ancillary and unexceptional misconduct, often failing to even investigate it. This caused officers to believe that there was not much to lose by lying to cover up misconduct.

f. Indeed, the DOJ found that allegations of false statements by officers were rarely taken seriously and largely ignored.

g. The City of Chicago did not bring a single charge against an officer for providing false testimony in court from 2011-2016, despite judges determining, on-the-record, that officer testimony was not credible.

h. Further, the City of Chicago rarely expanded pending misconduct investigations in order to charge officers with lying to cover up alleged police misconduct, despite investigators having the discretion to do so (although this discretion was essentially illusory).

i. Tellingly, despite the extremely low sustained rate for complaints, the DOJ discovered instances in which supervisors had lied just to prevent investigations into misconduct in the first place.

j. The DOJ also identified a significant number of incidents in which the evidence supported a conclusion that police officers had intimidated

potential complainants or witnesses from filing or participating in misconduct complaints (often by filing false charges against them).

k. Problematically, the DOJ found that the City of Chicago also failed to investigate and discipline officers for engaging in witness and complainant intimidation. The DOJ further concluded that these intimidation tactics were made effective by the City of Chicago's policy requiring complaints to be supported by an affidavit in order to be investigated.

l. Moreover, even when the City of Chicago did investigate claims that officers had made false statements, its investigators employed a higher standard to sustain such claims and failed to diligently review the investigative record to determine whether witness officers had lied in police reports or whether supervisors had blindly approved reports without attempting to determine whether the reports were fabricated.

m. The DOJ also found that the City of Chicago, until shortly before the DOJ's investigation, had not focused much attention on police officers' efforts to conceal misconduct by mishandling video and audio equipment, or even on ensuring that police conduct was captured on audio and video in the first place. As of January 2016:

    i. the audio capability of 80% of the Department's dash-cams was either not working or had been tampered with;

    ii. officers routinely removed microphone batteries, destroyed antennae, and stashed microphones in the glove box compartments of their squad cars; and

       iii.  officers consistently failed to check or sync their dash-cam microphones with the in-car system, rendering them useless (unsurprisingly, the City of Chicago rarely investigated whether these failures were deliberate or took any disciplinary action based on these failures).

n.  The DOJ concluded that these investigative deficiencies were partly due to inadequate staffing of the investigative bodies and poor training of the employees working for these bodies, including investigators;

o.  As for accountability, in the January 13, 2017 report, the DOJ concluded that the City of Chicago seldom held its police officers accountable for misconduct in general.

p.  The DOJ's investigation confirmed that the City of Chicago's accountability systems were broadly ineffective at deterring or detecting police misconduct, as well as at holding officers accountable when they violated the law or police department policy.

q.  Even in situations in which complaints of misconduct were "sustained," the DOJ found that discipline was haphazard and unpredictable, doing little to deter misconduct.

r.  Problematically:

       i.  the disciplinary process took too long and needlessly introduced opportunities to undermine accountability;

      ii.  the process allowed individuals who were sympathetic to officers to advocate for reduced or no discipline;

13

iii. there was a lack of appropriate guidance for determining the appropriate disciplinary action, resulting in too much discretion and inconsistency; and

iv. the City of Chicago's Police Board only provided another layer of review that undermined accountability by having various deficiencies and by being biased toward officers; and

s. The DOJ found that, as a result, officers were often disciplined only for conduct much less serious than what had been alleged, or not disciplined at all, despite complaints being "sustained" (partially due to a perversely lenient and misused complaint mediation program).

t. Moreover, even when actually facing discipline as a result of a complaint, from 2010 to 2017, City of Chicago police officers who challenged their discipline were able to reduce or entirely reverse it 85% of the time (including cases in which the officers had been accused of making false statements).

u. Specific to officer dishonesty, even when the City of Chicago did recommend discipline for officers who were found to have made false statements, the DOJ discovered that, almost one-third of the time, the only discipline recommended was a suspension of 25 days or less (and some of the more severe recommendations were reduced or overturned after the officers challenged the recommendation).

v. And, even when complaints alleging false statements by officers were "sustained," the offending officers faced little risk that the sustained

finding would impact the ability to testify in criminal cases in support of the related prosecution. Further, there was no system in place at all to ensure that sustained findings for these charges were provided to the State's Attorney's office or to the criminal defendants in the related criminal cases, even though providing such findings is required by U.S. Supreme Court precedent.

w.  The DOJ found that these deficiencies in the disciplinary system were partly due to the City of Chicago's failure to provide clear guidance on appropriate, fair, and consistent penalty ranges, undermining the effect of any discipline.

x.  The DOJ also found that deficiencies with the Chicago Police Board's systems impaired its ability to be an effective component of the accountability structure.

y.  In 2017, in *Laporta v. Chicago*, No. 14-cv-9665 (N.D.Ill), a jury found that the City of Chicago had a widespread practice/policy of failing to supervise and discipline officers, as well as that it failed to maintain an adequate early-warning system to identify problem officers. The jury awarded the plaintiff $44,700,000 against a City of Chicago police officer who shot his friend in the head with his service weapon while intoxicated. Prior to the shooting, the officer had been named in dozens of civilian complaints, as well as multiple police misconduct lawsuits, and had a record of alcohol-based misconduct.

z. The City of Chicago paid over half a billion dollars to settle or pay judgments in police misconduct cases from 2004 to January 2017, without even conducting disciplinary investigations in over half of those cases, and while recommending discipline in fewer than 4% of those cases.

45. In addition to the above facts, in *Obrycka v. City of Chicago*, a federal jury specifically found that, as of February 2007, the City of Chicago "had a widespread custom or practice of failing to adequately investigate and/or discipline its officers and/or of a police code of silence." *Obrycka v. City of Chicago*, 913 F. Supp. 2d 598, 604 (N.D. Ill. 2012).

46. The code of silence and these failures to investigate and discipline perpetuate and compound each other.

47. The DOJ found that the City of Chicago's investigative fact-finding into police misconduct and attempts to hold officers accountable are frustrated by the code of silence.

48. The DOJ also found that the cover-up culture among City of Chicago police officers thwarted misconduct investigations, especially because the City of Chicago's investigators viewed the code of silence as an immutable fact, instead of something to root out.

49. Similarly, the DOJ found that the City of Chicago's reluctance to investigate and discipline officers for making false statements only exacerbates and perpetuates the code of silence.

50. At the time of the violations alleged by DARRYL MOORE herein, and for years prior, the City of Chicago failed to adequately supervise its police officers in order to prevent them from taking police action without adequate legal cause, fabricating/manufacturing evidence, lying during investigations into police misconduct, lying to prosecutors, and lying during court proceedings.

51.     The following facts demonstrate the failure to adequately supervise:

   a.   In its report, the DOJ found that the City of Chicago's police department did not sufficiently encourage or facilitate supervisors to provide meaningful supervision to officers.

   b.   Overall, the department did not hold supervisors accountable for performing certain basic supervisory tasks, including guiding officer behavior or reporting misconduct, and there were structural deficiencies in how the department organized supervision, resulting in ineffective oversight of officer activities (supervisors spent too much time on non-supervisory tasks, supervised too many officers, did not supervise the same officers consistently; and were not trained adequately on how to appropriately supervise).

   c.   Further, the DOJ found that there was little incentive or opportunity for supervisors to meaningfully guide and direct officers, and that there was even less incentive for supervisors to hold officers accountable for misconduct.

   d.   Supervisors did not review personnel files of the officers they supervised, they were wary of intervening to correct rule or tactical errors because "no one wants to be the bad guy," and they were more concerned with being or staying friends with subordinates than providing adequate supervision.

   e.   In fact, the DOJ found that, rather than ensuring that officers under their watch were policing constitutionally, many sergeants instead focused on

keeping their subordinates out of trouble when there may have been reason for discipline.

f.  The DOJ also stated that officers provided little documentation of their activities and that sergeants consistently took a hands-off approach, letting the officers enforce how they saw fit. The DOJ found that supervisors often turned a blind eye to officer misconduct. In fact, the DOJ found that supervisors regularly failed to even forward civilian complaints about their officers to the appropriate investigative body as required.

g.  Moreover, even when supervisors were tasked with reviewing police officer activities, the DOJ found that their only role was to review whether the officers had filled out the reporting forms properly (and not whether the conduct being reported was proper).

h.  The DOJ found that the City of Chicago's police department also failed to hold supervisors accountable when *they* did not hold officers accountable or did not provide adequate oversight and direction; nor did the department properly incentivize or reward supervisors for swimming against this tide and providing close and effective supervision to officers or disciplining officers for committing misconduct.

i.  Compounding its supervision problems, the DOJ found that City of Chicago's police department did not have a meaningful early intervention system to effectively assist supervisors in identifying and correcting problematic behavior, and that the current behavior intervention systems are grossly underused and entirely inadequate.

j.   Again, in 2017, in *Laporta v. Chicago*, No. 14-cv-9665 (N.D.Ill), a jury found that the City of Chicago failed to maintain an adequate early-warning system to identify problem officers.

k.   As a result, the DOJ found that the City of Chicago's police department failed at accurately identifying officers in need of corrective action and failed at addressing officer behavior, even when it detects negative patterns, causing officers to be able to engage in problematic behaviors with impunity.

52.   At the time of the violations DARRYL MOORE alleges herein and for years prior, the City of Chicago's training program was not adequate to train its police officers to not take police action without adequate legal cause, to not fabricate/manufacture evidence, to not lie during investigations into police misconduct, to not lie to prosecutors, and to not lie during court proceedings.

53.   The following facts demonstrate the failure to adequately train:

a.   In its report, the DOJ found that the City of Chicago inattention to its police department training needs, including a longstanding failure to invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000 members, left officers underprepared to police effectively and lawfully.

b.   The DOJ further stated that officer errors and misconceptions that resulted from a lack of training were not corrected in the field; that, at the outset and through the duration of their careers, officers did not receive the quality or quantity of training necessary for their jobs; that, for many

years, the department's training academy suffered from severe deficiencies that impeded recruits' preparedness to police constitutionally and safely; and that the department's post-Academy Field Training Program was poorly structured and operated in a manner that actively undermined, rather than reinforced, constitutional policing.

c. Specifically, the DOJ reported that, although recruits were trained on police report writing, there had been insufficient attention to the validity of the training materials and to whether this content was effectively delivered. Problematically, the academy program relied on outdated materials that failed to account for updates in legal standards, widely accepted law enforcement standards, and departmental policies.

d. The DOJ further stated that the Field Training Officer Program, as it was then structured, did not attract a sufficient number of qualified, effective leaders to train new probationary police officers (in fact, Defendant DENNIS HUBERTS is now one), had an insufficient number of field training officers to meet demands, and failed to provide probationary police officers with appropriate training, mentorship, and oversight.

e. Finally, the DOJ stated that in-service training was not provided pursuant to any long-term training plan or strategy; instead, the department provided only sporadic in-service training.

54. The City of Chicago's failures to supervise and to train officers compound each other.

55.     The DOJ found that deficiencies in officer training were exacerbated by the lack of adequate supervision the City of Chicago's police department provided to officers in the field.

56.     The DOJ further found that, together, the shortcomings in training and supervision resulted in: officers who were unprepared to police lawfully and effectively; supervisors who did not mentor or support constitutional policing by officers; and a systemic inability to proactively identify areas for improvement, including Department-wide training needs and interventions for officers engaging in misconduct.

57.     At the time of the violations alleged by DARRYL MOORE herein, and for years prior, the code of silence, the failure to investigate/discipline, the failure to supervise, and the failure to train, described above, were persistent and widespread enough to render them standard operating procedures within the City of Chicago's police department.

58.     At the time of the violations alleged by DARRYL MOORE herein, and for years prior, as a result of the code of silence, the failure to investigate/discipline, the failure to supervise, and the failure to train, described above, the City of Chicago's police officers, including the individual Defendants, believed that they could take police action without adequate legal cause, fabricate/manufacture evidence, lie during investigations into police misconduct, lie to prosecutors, and lie during court proceedings, all with impunity.

59.     For years prior to the violations alleged herein by DARRYL MOORE, official policy-making officials of the City of Chicago were aware of the code of silence, the failure to investigate/discipline, the failure to supervise, and the failure to train, described above, yet they allowed these things to continue.

60.     Again, the Mayor has admitted that the code of silence existed during these years.

21

61.     Further, the Chicago Police Accountability Task Force reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority." And, the DOJ reported that the City of Chicago had long known that its police department's direct supervision of officers was inadequate, including through the fact that multiple reports in the prior two decades had highlighted deficiencies in the department's supervisory practices. The DOJ further reported that, despite this knowledge, the City of Chicago and police department leadership had not made the necessary reforms to the department's supervision structure and processes, causing community and officer safety to suffer.

62.     Official policy-making officials of the City of Chicago were aware that the code of silence, the failure to investigate/discipline, the failure to supervise, and the failure to train, described above, would cause constitutional violations like those DARRYL MOORE alleges herein because, for years prior to April 2013, there had been an extensive pattern of similar violations:

>     a.    From 2016 to the present, 42 people have had their criminal cases overturned or dismissed after City of Chicago police sergeant Ronald Watts and his tactical unit allegedly used fabricated evidence, used false evidence, and planted contraband in order to secure charges and convictions against them; many of these people complained about this conduct, but the City of Chicago failed to discipline him adequately and he was allowed to continue his corruption.
>
>     b.    Likewise, the City of Chicago and its police department failed to timely discipline officers Jerome Finnigan and Joseph Miedzianowksi who

separately engaged in a long patterns of misconduct and corruption that eventually led to their criminal convictions.

c.   In 2009, in *Johnson v. City of Chicago*, No. 05-cv-1042 (N.D. Ill.), a jury awarded $21,000,000 in damages to Juan Johnson against the City of Chicago after it found that Johnson had been wrongfully convicted of murder in 1991 based on fabricated evidence.

d.   In 2007, in *Finwall v. City of Chicago*, No. 04-cv-4663 (N.D. Ill.), a jury awarded Timothy Finwall $2,000,000 against the City of Chicago because officers had wrongfully arrested him in 2001 after fabricating evidence by, among other things, misreporting the results of a police lineup.

e.   In 2016, in *Fields v. City of Chicago*, No. 10-cv-1168 (N.D.Ill), a jury awarded Nathson Fields $22,000,000 after finding that he had been framed for a 1984 murder by City of Chicago police officers who falsified and withheld critical evidence.

f.   In 2017, in *Patrick v. City of Chicago*, No. 14-cv-3658 (N.D. Ill.), a jury awarded Deon Patrick more than $13,000,000 after it found that he had been wrongfully convicted of murder based on evidence fabricated by City of Chicago police officers, including a coerced confession.

g.   In 2018, in *Rivera v. Guevara*, No. 12-cv-4428 (N.D.Ill), a jury awarded Jacques Rivera more than $17,000,000 after finding that City of Chicago police detective with a long history of allegedly fabricating and withholding evidence, Reynaldo Guevara, had framed him for a 1998 murder.

h. The Chicago Reporter has found that the City of Chicago has paid $132,551,830 to settle police misconduct cases involving destroyed, concealed, or fabricated evidence.

i. The Chicago Reporter has also found that the City of Chicago has paid $173,852,871 to settle police misconduct cases involving false arrests or false reports.

63. Regardless of whether official policy-making officials of the City of Chicago were aware that the code of silence, the failure to investigate/discipline, the failure to supervise, and the failure to train, described above, would cause constitutional violations like those Moore alleges herein, for years prior to April 2013, it was patently obvious that these things would cause similar constitutional violations.

64. Indeed, at the time of these violations and for years prior, the City of Chicago effectively promoted such dishonesty within its police department in order to secure the prosecution and conviction of individuals, without regard for whether there was actually probable cause to charge or prosecute or for whether the evidence against them had been falsified.

65. The code of silence, the failure to investigate/discipline, the failure to supervise, and the failure to train, described above, and the City of Chicago's official policymakers' failure to correct them shock the conscience and constitute deliberate indifference to the rights of individuals.

66. The code of silence, the failure to investigate/discipline, the failure to supervise, and the failure to train, described above, caused City of Chicago police officers (namely, the individual Defendants) to violate Moore's constitutional rights.

24

67.     LIONEL PIPER has had at least 54 civilian complaints filed against him since 2000, which is more complaints per year than 99.2% of other City of Chicago police officers have had filed against them.

68.     27 of those complaints alleged that LIONEL PIPER had been involved in an illegal search, and 4 alleged that he had been involved in a false arrest.

69.     LIONEL PIPER has been accused of lying in police reports, lying to obtain a search warrant, planting contraband, lying about seeing a gun on a victim of a police shooting, stealing money and property during searches, threatening civilians, using an unsigned search warrant to search a property, illegally searching civilians, falsely arresting civilians, and harassing civilians, among other things.

70.     The City of Chicago has not sustained a single civilian complaint against LIONEL PIPER.

71.     Additionally, LIONEL PIPER has been named as a defendant in at least 5 other police misconduct lawsuits: *Lynell Alford v. City of Chicago, et al.*, No. 05-cv-5133 (N.D.Ill) (alleging that LIONEL PIPER and other officers covered up their use of excessive force by making false statements in police reports, withholding information, and initiating criminal charges against the plaintiff without legal cause); *Steven Wells v. City of Chicago, et al.*, No. 08-cv-598 (N.D.Ill) (alleging that LIONEL PIPER and other officers falsely arrested, illegally searched, and falsely detained the plaintiff, as well as stole money from the plaintiff during the arrest); No. 2004-L-2626 (Circuit Court of Cook County); No. 2001-L-002928 (Circuit Court of Cook County); No. 2007-L-12133 (Circuit Court of Cook County).

72.     Yet, the City of Chicago and its police department have not meaningfully investigated or disciplined LIONEL PIPER and have not adequately trained him to not engage in this sort of misconduct.

73.     Further, LIONEL PIPER testified at his deposition in this case that:

    a.  he did not know how many civilian complaints have been made against him;

    b.  he has never been disciplined for a civilian complaint;

    c.  he has never received informal counseling for a civilian complaint;

    d.  he has not been contacted by an investigator about any investigation into the civilian complaint made by DARRYL MOORE in relation to this incident;

    e.  that, although, every once in a while, he would get a half-sheet of paper with a complaint number, he did not know what they indicated or whether he was supposed to do anything about them (he actually laughed when asked whether he was supposed to do anything with these half-sheets); and

    f.  that he has never gotten anything stating that one had been sustained.

74.     DENNIS HUBERTS has had at least 20 civilian complaints filed against him since 2006, which is more complaints per year than 95% of other City of Chicago Police officers have had filed against them.

75.     11 of those complaints alleged that DENNIS HUBERTS had been involved in an illegal search, and 2 alleged that he had been involved in a false arrest.

76.     DENNIS HUBERTS has been accused of filing a false police report about a traffic accident that he had gotten into with a civilian, illegally searching civilians, falsely arresting civilians, using an unsigned warrant to search a home, planting contraband on civilians, and stealing money and property during searches, among other things.

77.     The City of Chicago has not sustained a single civilian complaint against DENNIS HUBERTS.

78.     Additionally, DENNIS HUBERTS has been named as a defendant in at least 3 other police misconduct lawsuits: *Andre Jackson v. City of Chicago, et al*, No. 14-cv-6746 (N.D.Ill) (alleging that DENNIS HUBERTS and another officer shot the plaintiff unjustifiably and then then provided false statements, prepared false reports, initiated false charges against the plaintiff, and lied in court proceedings to support the false charges); *Cassandra Weeks v. City of Chicago, et al.*, No. 12-cv-10056 (N.D.Ill) (alleging that DENNIS HUBERTS and other officers illegally procured a search warrant, illegally searched the plaintiff's home, damaged her property during the search, stole a television during the search, illegally seized her, planted drugs in her home, created false evidence, provided false police reports, prepared false witness statements, and then initiated false charges against her based on the fabricated evidence); No. 2011-L-9430 (Circuit Court of Cook County).

79.     Yet, the City of Chicago and its police department have not meaningfully investigated or disciplined DENNIS HUBERTS and have not adequately trained him to not engage in this sort of misconduct; instead, they have now allowed him to work as a field training officer, which only furthers the City of Chicago's widespread failure to train officers adequately.

80.     JEFFREY WEST has had at least 39 civilian complaints filed against him since 1999, which is more complaints per year than 97% of other City of Chicago Police officers have had filed against them.

81.     17 of those complaints alleged that JEFFREY WEST had been involved in an illegal search, and 2 alleged that he had been involved in a false arrest.

82.     JEFFREY WEST has been accused of illegally searching civilians, falsely arresting civilians, lying about events in a police report (falsely claiming that a woman had threatened to shoot him), told a civilian who had asked for his name and badge number: "my name is Officer West and you can tell them what I did," stealing property and money during searches, planting contraband on civilians, and trying to get a civilian to falsely admit that drugs were his and not someone else's, among other things.

83.     The City of Chicago has sustained only 2 civilian complaints against JEFFREY WEST (in 2001 and 2002), but those complaints were related to operations/personnel violations, and he was merely reprimanded in both cases.

84.     Additionally, JEFFREY WEST has been named as a defendant in at least 4 other police misconduct lawsuits: *Cassandra Weeks v. City of Chicago, et al.*, No. 12-cv-10056 (N.D.Ill) (alleging that JEFFREY WEST illegally procured a search warrant, illegally searched the plaintiff's home, damaged her property during the search, stole a television during the search, illegally seized her, planted drugs in her home, created false evidence, provided false police reports, prepared false witness statements, and then initiated false charges against her based on the fabricated evidence); *Steven Wells v. City of Chicago, et al.*, No. 08-cv-598 (N.D.Ill) (alleging that the plaintiff had been falsely arrested, searched, and detained, and that JEFFREY WEST and other officers stole money from the plaintiff during the arrest); *Williams v. City of Chicago, et al.*,

No. 01-cv-5720 (N.D.Ill.) (alleging that OFFICER WEST illegally searched the plaintiff); *Lavette Johnson v. City of Chicago, et al.*, No. 05-cv-1368 (N.D.Ill) (alleging that JEFFREY WEST and other officers illegally procured a search warrant, illegally searched the plaintiff's apartment, falsely arrested the plaintiff, and maliciously prosecuted the plaintiff by fabricating evidence, giving false testimony, and submitting false police reports).

85.     Yet, the City of Chicago and its police department have not meaningfully investigated or disciplined JEFFREY WEST and have not adequately trained him to not engage in this sort of misconduct; instead, they promoted him to sergeant in February 2016, which only furthers and perpetuates the systemic issues complained of herein

86.     DACHAE BLANTON has had at least 30 civilian complaints filed against her since 1998, which is more complaints per year than 93% of other City of Chicago Police officers have had filed against them.

87.     4 of those complaints alleged that DACHAE BLANTON had been involved in an illegal search, 2 alleged that she had been involved in a false arrest, and 1 alleged that she had failed to perform her supervisory responsibilities.

88.     DACHAE BLANTON has been accused of illegally searching civilians, falsely arresting civilians, planting drugs on civilians, fabricating evidence, providing false testimony, and lying about a civilian (falsely claiming that the civilian had made incriminating statements), among other things.

89.     The City of Chicago and its investigative entities have sustained only 1 civilian complaint against DACHAE BLANTON (in 1999), but she was not disciplined at all as a result.

90.     Additionally, DACHAE BLANTON has been named as a defendant in at least 5 other police misconduct lawsuits: *Lavette Johnson v. City of Chicago, et al.*, No. 05-cv-1368 (alleging

29

that DACHAE BLANTON and other officers illegally procured a search warrant, illegally searched the plaintiff's apartment, falsely arrested the plaintiff, and maliciously prosecuted the plaintiff by fabricating evidence, giving false testimony, and submitting false police reports); *Joseph Latham v. City of Chicago, et al.*, No. 03-cv-7984 (N.D.Ill) (alleging that DACHAE BLANTON falsely arrested the plaintiff and lied in court proceedings about the incident that resulted in the arrest); *Otha Stewart v. City of Chicago, et al.,* No. 06-cv-416 (N.D.Ill) (alleging that DACHAE BLANTON and other officers falsely arrested the plaintiff and maliciously prosecuted him for solicitation by fabricating evidence and submitting false police reports); *Lesley Taylor, et al. v. City of Chicago, et al.*, No. 07-cv-876 (N.D.Ill) (alleging that DACHAE BLANTON and other officers falsely arrested the plaintiffs, as well as maliciously prosecuted them and deprived them of their due process rights by filing false charges, submitting false police reports, fabricating evidence, and withholding exculpatory evidence); *Rita Kimbrough v. P.O. Pittman, et al.,* No. 07-cv-3711 (N.D.Ill) (alleging that DACHAE BLANTON and other officers falsely arrested the plaintiff).

91.     Yet, the City of Chicago and its police department have not meaningfully investigated or disciplined DACHAE BLANTON and have not adequately trained her to not engage in this sort of misconduct; instead, they promoted her to lieutenant in February 2017, which only furthers and perpetuates the systemic issues complained of herein.

92.     GREGORY SLOYAN has had at least 17 civilian complaints filed against him since 1996, which is more complaints per year than 76% of other City of Chicago Police officers have had filed against them.

93.     8 of those complaints alleged that GREGORY SLOYAN had been involved in an illegal search, and 2 alleged that he had been involved in a false arrest.

94.     GREGORY SLOYAN has been accused of illegally searching civilians, falsely arresting civilians, planting contraband on civilians, stealing money, medication, and property during searches, using an unsigned warrant to search a civilian's home, falsely claiming he had a warrant to search a civilian's home, and lying in police reports, among other things.

95.     The City of Chicago and its investigative entities have sustained only 4 civilian complaints against GREGORY SLOYAN (2 in 2000, 1 in 2004, and one 2014). For one of these, the only action taken was that a violation was "noted"; for another (an operations/personnel violation), the only action taken was a reprimand; for another (verbal abuse), the only action taken was a reprimand; and for another (use of force), the only action taken was a 3-day suspension.

96.     Additionally, GREGORY SLOYAN has been named as a defendant in at least 3 other police misconduct lawsuits: *Cassandra Weeks v. City of Chicago, et al.*, No. 12-cv-10056 (N.D.Ill) (alleging that GREGORY SLOYAN and other officers illegally procured a search warrant, illegally searched the plaintiff's home, damaged her property during the search, stole a television during the search, illegally seized her, planted drugs in her home, created false evidence, provided false police reports, prepared false witness statements, and then initiated false charges against her based on the fabricated evidence); *Elmon Mims, et al., v. City of Chicago, et al.*, No. 17-cv-7391 (N.D.Ill) (alleging that GREGORY SLOYAN and other officers obtained a search warrant using fabricated information allegedly from a "John Doe" informant, illegally searched the plaintiffs' homes, and illegally seized the plaintiffs); *Timothy Collier v. City of Chicago, et al.*, No. 14-cv-2157 (N.D.Ill) (alleging that GREGORY SLOYAN and other officers falsely arrested the plaintiff, planted evidence, falsified police reports, and withheld information, and maliciously prosecuted the plaintiff).

31

97. Yet, the City of Chicago and its police department have not meaningfully investigated or disciplined GREGORY SLOYAN and have not adequately trained him to not engage in this sort of misconduct; instead, they promoted him to lieutenant in June 2016, which only furthers and perpetuates the systemic issues complained of herein.

98. On information and belief, none of the individual Defendants were ever enrolled in any sort of early intervention system.

99. The City of Chicago has paid at least $100,000 to settle the lawsuits against the Defendant officers.

100. As a result of the code of silence and the City of Chicago's systemic failures, the Defendant officers believed that they were acting with impunity and could charge DARRYL MOORE without probable cause, fabricate evidence, submit false police reports, tell false stories to prosecutors, and provide false testimony during DARRYL MOORE's prosecution without facing any negative consequences.

101. As a result, Moore suffered significant harm, as more fully described herein.

102. The City of Chicago is therefore directly liable to Moore under 42 U.S.C. Section 1983 for the constitutional violations alleged herein.

**Count IV: Against the City of Chicago for Indemnification**

103. Plaintiff hereby incorporates and re-alleges the above paragraphs as though fully set forth at this place.

104. Pursuant to 745 ILCS 10/9-102, the City of Chicago is empowered and directed to pay any tort judgment or settlement for compensatory damages (and may pay any associated attorney's fees and costs) for which an employee while acting within the scope of his employment is liable.

105.    The acts of the individual defendants were committed within the scope of their employment.

106.    In the event that a judgment for compensatory damages is entered against any or all of the individual defendants, the City of Chicago must pay the judgment[3] and may pay the associated attorneys' fees and costs.


WHEREFORE, DARRYL MOORE, by and through his attorney, Law Office of Julie O. Herrera, request that LIONEL PIPER, JEFFREY WEST, DENNIS HUBERTS, GREGORY SLOYAN, DACHAE BLANTON, and the CITY OF CHICAGO be found liable and that they be ordered to pay compensatory damages, punitive damages (individual Defendants only), attorney's fees pursuant to 42 U.S. Code § 1988, and costs; and that the CITY OF CHICAGO be ordered to pay all of the award except punitive damages.

Respectfully submitted,

BY:     s/ Steven J. Molitor

        s/ Julie O. Herrera


Law Office of Julie O. Herrera
53 W. Jackson, Suite 1615
Chicago, IL 60604
Tel: 312-697-0022
Fax: 312-697-0812
jherrera@julieherreralaw.com
smolitor@julieherreralaw.com

---

[3] excluding punitive damages